United States District Court
Southern District of Texas
**ENTERED**
March 30, 2017
David J. Bradley, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| PAUL WAYNE SLATER, | § | |
| | § | |
| Petitioner, | § | |
| VS. | § | CIVIL ACTION NO. 4:14-CV-3576 |
| | § | |
| LORIE DAVIS, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM AND ORDER

In 1996, a Texas jury convicted Paul Wayne Slater of capital murder and he was sentenced

to death.  After unsuccessfully availing himself of state appellate and post-conviction remedies,

Slater filed a federal petition for a writ of habeas corpus.  (Docket Entry No. 21).  Respondent Lorie

Davis has moved for summary judgment.  (Docket Entry No. 30).  The issue now before the Court

is whether Slater has shown an entitlement to relief under the Anti-Terrorism and Effective Death

Penalty Act ("AEDPA").  Having considered the record, the pleadings, and the law, the Court grants

the summary judgment motion and denies Slater's federal habeas petition.  The Court will not issue

a Certificate of Appealability.

I.      **Background**

        A.      **The Crime and the Trial**

        On July 19, 1995, Eric Washington left Wharton, Texas with $3,000 to buy six ounces of

crack cocaine.  After picking up Roddrick Martin and Glenn Andrews, Washington drove to a

carwash in southwest Houston.  Washington parked his car near the vacuum cleaner.  A short time

later a Cadillac with two men inside circled the carwash and pulled into a wash bay. Martin and

Andrews got into the backseat of the Cadillac.  Within minutes, Martin and Andrews had been shot

and Washington had fled the scene.

Fire department personnel responded to a call about gunfire, finding Martin and Andrews lying in the car wash bay. Both men had been shot several times. Andrews was pronounced dead at the scene and Martin died en route to the hospital. Responders found two small stacks of bills totaling $200 lying on the ground near Martin.

On August 9 1995, the police stopped a Cadillac driven by teenager Julius Woods. A subsequent search revealed trace evidence of blood inside the car. A bullet strike marred an interior panel. Over a month later, Slater showed up at the police station with his aunt. Slater provided the police a videotaped statement in which he admitted that he and Woods met the victims to engage in a drug deal. Slater also admitted that he shot the victims. In his statement, however, Slater disclaimed any intent to rob or kill the victims. Slater said that, as he was sitting in the front passenger seat at the carwash, one of the men in the back drew a weapon. Slater claimed that he then grabbed his own 9mm pistol and started shooting. Slater said that Woods never fired any shots. He also said that Washington, who had been waiting in the other vehicle, also started firing a weapon and that one of his bullets may have hit the victims. Slater claimed that, before driving away, he left the victim's guns and a bag of cash at the carwash.

The State of Texas charged Slater with committing capital murder during the course of a robbery. Clerk's Record at 6.[1] The prosecution elected to proceed under Texas' law of parties which allowed for Slater's capital-murder conviction as a party "if the offense is committed by his own

---

[1]     The State of Texas indicted Slater for capital murder under three theories: (1) killing both Andrews and Martin during the same criminal transaction; (2) shooting Andrews during a robbery or attempted robbery; or (3) shooting Martin during a robbery or attempted robbery. Clerk's Record at 6. Slater was arraigned only on the charge of causing Martin's death in the course of committing and attempting to commit a robbery. Tr. Vol. 15 at 15.

conduct, by the conduct of another for which he is criminally responsible, or by both." Clerk's Record at 65; *see* TEX. PENAL CODE ANN. §§ 7.01, 7.02.

Slater retained attorney Charles Freeman to represent him at trial. Slater's confession served as the backbone of his defense. The defense portrayed the crime as a drug deal gone bad, with Slater reflexively shooting when the buyers brandished weapons. As the Court will discuss later, while initially intending to focus the defense on both the lack of a robbery and self-defense, decisions made by Freeman and by Slater shaped the manner in which the jury could consider Slater's confession. In the end, the defense attempted to convince jurors that Slater accurately described the crime in his police statement.

The State also relied on Slater's confession to the crime, supplemented with evidence contradicting the self-serving elements of his narrative. The State emphasized Washington's eyewitness testimony which differed in important aspects from the account given by Slater. Washington testified that the drug buyers did not have weapons. Washington testified that Martin was carrying money in the front of his shorts, though the police never recovered any on his body. Washington saw one occupant of the Cadillac get out and open the trunk. At that point, Washington became momentarily distracted until he heard gunshots. Washington looked up to see the driver of the Cadillac firing a pistol into the back seat. The passenger was outside the car also, firing into an open back door.

Forensic evidence confirmed the portions of Washington's testimony that differed from Slater's police statement. Bullets recovered from the autopsies were from two different weapons, disputing Slater's statement that Woods did not fire a gun. The trajectory of bullet strikes and the victims' wounds refuted Slater's description of having shot from the passenger seat. No weapons

3

were found in the carwash.[2]

The jury found Slater guilty of capital murder.

After a Texas jury has convicted a capital defendant, state law determines his sentence through answers to special issue questions. In this case, the trial court's instructions required the jury to decide (1) whether Slater would be a future societal danger, (2) whether Slater actually caused the death of Martin or intended that a human life would be taken,[3] and (3) whether sufficient circumstances mitigated against the imposition of a death sentence. Clerk's Record at 441-42. The State presented testimony that Slater would be a future societal danger based on his commission of four extraneous crimes: (1) Slater participated in the delivery of crack cocaine to an undercover narcotics officer in February of 1991; (2) Slater shot a teenager in the buttocks for no apparent reason and then pointed his gun at the pastor during a church youth activity in February of 1991; (3) during a traffic stop in 1994, police found Slater seated near masks, a loaded machine gun, and a loaded pistol; and (4) Slater pawned items stolen during a burglary in 1995. A jail officer opined that, after reviewing jail records which included offenses Slater committed in custody such as assaulting other inmates and refusing to obey orders, Slater would be a future danger while incarcerated.

The defense called only one punishment-phase witness, Slater's mother Barbara Wiley.

---

[2]     One of Slater's friends told police that Slater admitted that he had intended to rob the victims. The friend said that Slater told her that "there were no real drugs that some dude had some wax and was trying to rip [Andrews] off for his money." Tr. Vol. 16 at 76. The friend, however, disclaimed that statement at trial. Tr. Vol. 16 at 76-77.

[3]     By statute, "in cases in which the jury charge at the guilt or innocence stage permitted the jury to find the defendant guilty as a party," the trial court instructs jurors to decide a separate special issue question that asks "whether the defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken." TEX. CRIM. PRO. CODE, art. 37.071 § 2(b)(2). This instruction, often called an "anti-parties charge," "protects the defendant's constitutional rights by ensuring that a jury's punishment-phase deliberations are based solely upon the conduct of that defendant and not that of another party." *Martinez v. State*, 899 S.W.2d 655, 657 (Tex. Crim. App. 1994).

4

Wiley provided only brief testimony which focused on her son's low IQ (63) and his low academic functioning. Wiley described how, at age five, Slater ran out into the street and a car hit him. The resultant head injury required surgery and changed his educational development.

After the arguments by the parties, the jury answered Texas' special issue questions in a manner requiring the imposition of a death sentence. The trial court sentenced Slater to death.

### B.    State Appellate and Post-Conviction Review

Brian W. Wice represented Slater on direct appeal and filed an appellate brief raising thirty-four points of error. In an opinion dated April 15, 1998, the Court of Criminal Appeals affirmed Slater's conviction and sentence. *Slater v. State*, No. 72,623 (Tex. Crim. App. Apr. 15, 1998) ("Opinion on Direct Appeal").

The trial court appointed Cynthia J. Cline to represent Slater on state habeas review. In 1998, Slater filed a state habeas application raising sixteen grounds for relief. State habeas review moved sluggishly. The State did not file a reply until 2002. When nothing happened in the case for several years, the Court of Criminal Appeals requested a status update in 2008. The trial court then took the case under advisement until the State filed a supplemental response in 2012. In August 2012, the Court of Criminal Appeals sent a notice to the lower court requiring the resolution of all claims within 120 days. The parties submitted proposed findings and conclusions. On March 5, 2014, the state habeas court entered findings of fact and conclusions of law recommending that the Court of Criminal Appeals deny habeas relief. State Habeas Record at 1073-1117.[4] The Court of Criminal Appeals adopted the lower court's findings and conclusion and, based on its own review of the

---

[4]    The lower habeas court signed a first set of recommendations on February 13, 2014, State Habeas Record at 1069, but later entered an amended recommendation.

record, denied relief. *Ex parte Slater*, No. WR-78,134-01, 2014 WL 6989189, at *1 (Tex. Crim. App. Dec. 10, 2014).

### C.    Federal Petition

Federal review followed. Slater filed a federal petition for a writ of habeas corpus raising the following grounds for relief:

1.    Trial counsel provided ineffective assistance at the guilt-innocence stage of trial by not requesting a jury instruction on the lesser-included offense of murder.

2.    Trial counsel provided ineffective assistance at the punishment stage of trial by not investigating and presenting evidence of Slater's organic brain impairment and learning disabilities.

3.    Trial counsel performed deficiently in the punishment phase closing argument.[5]

4.    Appellate counsel should have raised a challenge to the trial court's instructions on extraneous offenses.

5.    The death penalty violates the constitutional prohibition against cruel and unusual punishment.

Respondent has filed a motion for summary judgment. (Docket Entry No. 30). Respondent argues that Slater raises three of his claims in a procedurally deficient manner and that none of his claims merit habeas corpus relief. Slater has filed a response. (Docket Entry No. 35). This matter is ripe for adjudication.

## II.    Legal Standards

Federal habeas review is secondary to the state court process and is limited in scope. The States "possess primary authority for defining and enforcing criminal law. In criminal trials they also

---

[5]    Slater combines claims two and three into a single ground for relief. Because they implicate different factual and procedural issues, the Court will consider them as separate grounds and renumber Slater's claims accordingly.

hold the initial responsibility for vindicating constitutional rights." *Engle v. Isaac*, 456 U.S. 107,

128 (1982). How an inmate has litigated his claims in state court determines the course of federal

habeas adjudication. Under 28 U.S.C. § 2254(b)(1), "[a]n application for a writ of habeas corpus

on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless

it appears that . . . the applicant has exhausted the remedies available in the courts of the State[.]"

Exhaustion "reflects a policy of federal-state comity designed to give the State an initial opportunity

to pass upon and correct alleged violations of its prisoners' federal rights." *Anderson v. Johnson*,

338 F.3d 382, 386 (5th Cir. 2003) (internal citations and quotations omitted).[6] Federal habeas courts

only possess authority to deny any claim that an inmate has not exhausted through the state court

process. *See* 28 U.S.C. § 2254(b)(2).

As a corollary to exhaustion, the procedural-bar doctrine requires inmates to litigate their

claims in compliance with state procedural law. *See Dretke v. Haley*, 541 U.S. 386, 392 (2004);

*Lambrix v. Singletary*, 520 U.S. 518, 523 (1997); *Coleman v. Thompson*, 501 U.S. 722, 729 (1991).

"Procedural default . . . occurs when a prisoner fails to exhaust available state remedies and the court

to which the petitioner would be required to present his claims in order to meet the exhaustion

requirement would now find the claims procedurally barred." *Bagwell v. Dretke*, 372 F.3d 748, 755

(5th Cir. 2004) (quotation omitted). When state remedies are rendered unavailable by petitioner's

own procedural default, a federal court "will forego the needless 'judicial ping-pong' and hold the

claim procedurally barred from habeas review." *Sones v. Hargett*, 61 F.3d 410, 416 (5th Cir. 1995)

(quoting *Steel v. Young*, 11 F.3d 1518, 1524 (10th Cir. 1993)). A federal court may review an

---

[6]     The State may "expressly waive[] the [exhaustion] requirement." 28 U.S.C. § 2254(b)(3). Slater asks
*Respondent to waive exhaustion in this case.* (Docket Entry No. 21 at 18). *Respondent has declined to do so.* (Docket
Entry No. 30 at 40, 50, 56).

inmate's unexhausted or procedurally barred claims only if he shows: (1) cause and actual prejudice or (2) that "a constitutional violation has 'probably resulted' in the conviction of one who is 'actually innocent[.]'" *Haley*, 541 U.S. at 393 (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).

If the inmate has presented his federal constitutional claims to the state courts in a procedurally proper manner, and the state courts have adjudicated the merits, AEDPA allows federal review but provides deference to the state court judgment. "[F]ocus[ing] on what a state court knew and did," *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011), a habeas petitioner "has the burden under AEDPA to prove that he is entitled to relief," *Montoya v. Johnson*, 226 F.3d 399, 404 (5th Cir. 2000), to show that the state court's adjudication of the alleged constitutional error "was 'contrary to, or involved an unreasonable application of, clearly established Federal law.'" *Berghuis v. Thompkins*, 560 U.S. 370, 380 (2010) (quoting 28 U.S.C. § 2254(d)(1)); *see also Thaler v. Haynes*, 559 U.S. 43, 47 (2010); *Bell v. Cone*, 535 U.S. 685, 698 (2002); *Early v. Packer*, 537 U.S. 3, 7-8 (2002); *Williams v. Taylor*, 529 U.S. 362, 413 (2000).[7] A federal habeas court must presume the underlying factual determinations of the state court to be correct, unless the inmate "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003); *Young v. Dretke*, 356 F.3d 616, 629 (5th Cir. 2004) ("As a federal habeas court, we are bound by the state habeas court's factual findings, both implicit and explicit.").

A petitioner's compliance with AEDPA does not alone create an entitlement to habeas relief.

---

[7]      An application of clearly established federal law is unreasonable if the state court identifies the correct governing legal principle, but unreasonably applies that principle to the facts. *See Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). An unreasonable application of law differs from an incorrect application; thus, a federal habeas court may correct what it finds to be an incorrect application of law only if this application is also objectively unreasonable. *Id.* at 409-11. Federal habeas relief from a state court's determination is precluded "so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011).

No Supreme Court case "ha[s] suggested that a writ of habeas corpus should automatically issue if a prisoner satisfies the AEDPA standard[.]" *Horn v. Banks*, 536 U.S. 266, 272 (2002); *see also Robertson v. Cain*, 324 F.3d 297, 306 (5th Cir. 2003) (finding that 28 U.S.C. § 2254(d) "does not require federal habeas courts to grant relief reflexively"). Judicial doctrines, such as the harmless-error doctrine and the non-retroactivity principle, bridle federal habeas relief. *See Thacker v. Dretke*, 396 F.3d 607, 612 n.2 (5th Cir. 2005). A trial error cannot require habeas relief unless it "ha[d] a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Robertson*, 324 F.3d at 304 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 629 (1993)); *see also Aleman v. Sternes*, 320 F.3d 687, 690-91 (7th Cir. 2003) ("Nothing in the AEDPA suggests that it is appropriate to issue writs of habeas corpus even though any error of federal law that may have occurred did not affect the outcome."). Also, under the jurisprudence flowing from *Teague v. Lane*, 489 U.S. 288 (1989), a habeas court cannot grant relief if it would require the creation and retroactive application of new constitutional law. *See Horn*, 536 U.S. at 272.

Respondent has moved for summary judgment. Summary judgment is proper when the record shows "that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). "As a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases." *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000). A district court considering a motion for summary judgment usually construes disputed facts in a light most favorable to the nonmoving party, but must also view the evidence through "the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). The general summary judgment standards hold to the extent they do not conflict with AEDPA and other habeas law. *See Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir.2002)

9

(Rule 56 "applies only to the extent that it does not conflict with the habeas rules"), *overruled on other grounds by Tennard v. Dretke*, 542 U.S. 274 (2004).

## III.    Analysis

Slater raises five grounds for relief in his federal habeas petition. Slater raises claims three, four, and five for the first time on federal habeas review. A procedural bar precludes consideration of any unexhausted grounds for relief. *See Coleman*, 501 U.S. at 736 n.1.[8] Slater argues that he can show cause and actual prejudice to overcome the procedural bar of those claims. As discussed below, Slater has not shown any basis to forgive the procedural deficiencies in his unexhausted claims. Alternatively, the Court finds that Slater has not shown that any of his claims merit federal habeas relief.

### A.    Lesser-Included Instruction on Murder (Claim One)

Slater argues that Freeman provided deficient performance by failing to request an instruction that would allow jurors to convict him of a crime other than capital murder. Slater bases his lesser-included-offense-instruction claim on the version of the crime he provided in his police statement. The prosecution admitted Slater's videotaped confession into evidence and played it for the jury.

---

[8]    Slater asks the Court to stay and abate this case to allow the state courts to review his claims. In *Rhines v. Weber*, 544 U.S. 269, 275 (2005). the Supreme Court authorized a limited stay-and-abeyance practice in federal court that allows for the development of meritorious claims while preserving AEDPA's concern for finality and expediency. *See id.* at 278. *Rhines*, however, hardly requires federal courts to stay every petition advancing unexhausted claims. *Rhines* only authorizes stay and abeyance when the petitioner shows: (1) good cause for failing to exhaust the claim; (2) that the claim is not plainly meritless; and (3) that he has not intentionally engaged in dilatory tactics. *See id.* at 277. The exhaustion doctrine, including the stay-and-abeyance safety valve, is predicated on the availability of state court remedies. *See* 28 U.S.C. § 2254(B)(1). Texas strictly enforces its abuse-of-the-writ doctrine (codified at TEX. CODE CRIM. PRO. art. 11.071 § 5(a)) and generally prohibits the filing of successive habeas applications. While article 11.071 sanctions the filing of a successive habeas application in three limited circumstances, Slater does not establish that he meets its demanding requirements. Article 11.071 § 5(a)(1) authorizes the filing of a successive application when the claims "have not been and could not have been presented previously . . . because the factual or legal basis for the claim was unavailable[.]" Slater does not provide a viable argument to allow successive state review. Because Texas would apply its procedural law to prohibit the filing of a successive state application, staying Slater's federal petition would insert needless delay into these proceedings.

Tr. Vol. 16 at 22, 112-13; State's Exhibit 39A. In his statement, Slater told the police that, after he took cocaine from the trunk and showed it to the buyers, one of them brandished a gun. Slater began shooting and then drove away without taking any money.

Slater's confession raised two potential defenses. First, the evidence raised a question of whether Slater killed during the course of a robbery. Slater argues that his police statement "negated the robbery element of capital murder and raised fact issues as to whether he was committing a robbery . . . ." (Docket Entry No. 21 at 25). Second, Slater's statement allowed the defense to argue that the murders were an act of self-defense. While Slater's police statement provided details to substantiate those defenses, Freeman anticipated that Slater would take the stand and provide jurors his account of the murders. Relying on the construction of events found in his police statement, Slater argues that Freeman should have requested a lesser-included-offense instruction on simple murder.

Because Slater exhausted this claim on state habeas review, AEDPA guides this Court's review. Slater must not only meet his burden of showing that Freeman provided deficient representation, he must also show that the state habeas court's rejection of this claim was contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

### 1.    Ineffective-Assistance-of-Counsel Standard

Courts evaluate an attorney's efforts under the standard from *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a criminal defendant's Sixth Amendment rights are "denied when a defense attorney's *performance* falls below an objective standard of reasonableness and thereby *prejudices* the defense." *Yarborough v. Gentry*, 540 U.S. 1, 3 (2003) (emphasis added); *see also Rompilla v. Beard*, 545 U.S. 374, 387 (2005); *Wiggins v. Smith*, 539 U.S. 510, 520 (2003).

11

Counsel's performance is constitutionally deficient if it falls below "an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. "[J]udicial scrutiny of counsel's performance must be highly deferential," and every effort must be made to eliminate "the distorting effects of hindsight." *Id.* at 689. An ineffective-assistance claim focuses on "counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct[,]" because otherwise "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence." *Id.* The law honors an attorney's "conscious and informed decision on trial tactics and strategy," allowing for federal relief only when "it is so ill chosen that it permeates the entire trial with obvious unfairness." *Cotton v. Cockrell*, 343 F.3d 746, 752-53 (5th Cir. 2003). The prejudice element requires the movant to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

While "[s]urmounting *Strickland*'s high bar is never an easy task," a habeas petitioner's duty to "[e]stablish[] that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "The standards created by *Strickland* and § 2254(d) are both highly deferential, . . . and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (citation omitted); *see also Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

### 2.    Trial Counsel's Strategy and Slater's Choices

Because the State of Texas charged Slater with capital murder, the prosecution needed to prove that he committed murder, as defined by TEX. PENAL CODE § 19.02(b)(1), and intentionally

12

did so "in the course of committing or attempting to commit . . . robbery." TEX. PENAL CODE § 19.03(a)(2). Freeman faced difficult choices when forming a defense for his client. As Slater concedes, "[t]he evidence was undisputed that petitioner caused Martin's death individually or as a party." (Docket Entry No. 21 at 31). Slater's statement to police provided the best hope for crafting a successful defense. Slater's police statement drove counsel's choices about the theories which would underlie the trial defense, but those choices came with consequences. The strictures of federal and state law channeled the decisions Freeman would make in fashioning Slater's police statement into a defense.

As mandated by *Beck v. Alabama*, 447 U.S. 625 (1980), Texas allows defendants to request jury instructions on lesser-included offenses to capital murder, including simple murder. The Court of Criminal Appeals has "consistently held that an accused is entitled to an instruction on every defensive issue raised by the evidence. This is true regardless of whether such evidence is strong or weak, unimpeached or contradicted, and regardless of what the trial court may or may not think about the credibility of this evidence." *Hayes v. State*, 728 S.W.2d 804, 807 (Tex. Crim. App. 1987). Requesting a lesser-included-offense instruction on simple murder would have provided an option for jurors who believed that the State had not proven the robbery component of capital murder but disbelieved his self-defense argument. Still, that strategy anticipated a conviction for simple murder.

To that end, the defense could also request a jury instruction on the justification of self-defense. From the beginning of trial proceedings, Freeman indicated that a main focus of the defense's case would be a claim of self-defense. Tr. Vol. 3 at 46-47. The trial court initially prepared "three pages worth of" instructions on "the law of self-defense." Tr. Vol. 17 at 9. The jury, however, could only acquit Slater in that circumstance if the jury found both that he had not

13

committed robbery and that he acted in self-defense.  As will be discussed below, the trial court refused to deliver an instruction on self-defense unless the defense requested a lesser-included-offense instruction on simple murder.

Another choice, however, presented itself to the defense.  The defense could allow the jury charge to go forward without any lesser-included instructions, and hope that the jury would acquit on capital murder because no predicate robbery had occurred.  This choice would be risky and limited the defense's options, particularly because the trial court early in the case told counsel that self-defense would not be a justification unless Slater requested a lesser-included instruction on simple murder.  Tr. Vol. 4 at 149-50.

After both parties rested, Freeman had a private conversation with Slater before the parties finished discussing the jury charge in this case.  The transcript indicates that Slater and his attorney had a long discussion, but provides few details about its content:

| Trial Court: | All right. Mr. Freeman, according to the clock on the wall, you and Mr. Slater have had an opportunity to visit for about 35 minutes. Insofar as your discussion is concerned—obviously I don't know what it is or what it was—but is there anything further insofar as the charge is concerned that has evolved from your discussion? |
|---|---|
| Freeman: | I mean, we have been fully discussing it, your Honor. We had not quite reached a—we reached a tentative decision, but I was not satisfied that it was an informed decision on his part. Tentative decision was to not change my initial statement to the Court. |
| Trial Court: | You are the lawyer. |
| Freeman: | The reason I'm saying that it's not informed is I'm not certain he understands the consequences of that decision. I'm trying to make that clear to him. |
| Trial Court: | I will let you visit with him from right there for five minutes. I'm going to want an answer . . . . |

14

Freeman:      I understand.

Tr. Vol. 17 at 6. After speaking again with Slater, Freeman apparently informed the trial court that he would not request a lesser-included-offense instruction on murder. Tr. Vol. 17 at 7-9.[9]

Once Slater decided not to request an instruction on murder, the trial court refused to give an instruction on self-defense. After reviewing the jury charge, the trial court told the parties that "[t]he relevant facts and circumstances [of the] request [for a self-defense instruction] that Mr. Freeman has made obviously that would be an issue in a murder case." Tr. Vol. 17 at 24. However, because "the jury is specifically told that they cannot convict unless they find beyond a reasonable doubt the robbery was committed. It is . . . my understanding that self-defense doesn't apply in a robbery-capital murder [case]." Tr. Vol. 17 at 25.[10] The trial court admitted that self-defense could be a factor in a "murder case," and he could "see it going into some kinds of capital murders." Tr. Vol. 17 at 25. The trial court ordered a recess so that the parties could research whether a self-defense instruction was appropriate in this case. Tr. Vol. 17 at 26.

When the parties returned the prosecutor, after conferring with an attorney in the appellate section, said "justification is not a part of the defense in this case, because it is a murder-robbery situation" and thus the State objected to a self-defense instruction. Tr. Vol. 17 at 31. Freeman referred to the Texas statute governing "evidence in prosecutions for murder," TEX. CODE CRIM.

---

[9]     After a short recess, the trial court asked Freeman, "The answer is?" to which the record reflects Freeman replied, "Came." Tr. Vol. 17 at 7. This is likely a typographical error. The record that follows, however, makes it clear that Slater decided to forgo a lesser-included-offense instruction on simple murder.

[10]     Texas law recognizes that "[g]enerally, a person committing the offense of robbery has no right of self-defense against his intended victim." *Dillard v. State*, 931 S.W.2d 689, 697 (Tex. App. 1996).

PRO. art. 38.36,[11] and observed that it specifically included an allowance for presenting evidence of self-defense as a justification for murder. Tr. Vol. 17 at 33-34. The trial court stated that the statute did not specifically refer to "all prosecutions for capital murder," and denied the request on that basis. Tr. Vol. 17 at 34.[12] Freeman strenuously, but unsuccessfully, argued against the trial court's denial of a self-defense instruction. Tr. Vol. 17 at 38-40. Freeman's guilt/innocence closing summation argued that Slater had not committed a robbery.

### 3.    State Habeas Review

Slater's state habeas application raised two interrelated claims: Freeman should have requested a lesser-included-offense instruction on simple murder and the trial court should have given an instruction on self-defense. Slater's claims turned on the conversation at the defense table before Freeman announced that they would forgo an instruction on simple murder. Slater and Freeman both submitted habeas affidavits providing different descriptions of that conversation. In a "preliminary affidavit" dated January 24, 2002,[13] Freeman said that, "up until that very moment" the "mutual trial strategy was . . . to ask for the kitchen sink" which included "each lesser offense of capital murder charged in the indictment in this cause." State Habeas Record at 194. Plans changed when Slater "surprisingly, albeit expressly, elected to pursue an 'all-or-nothing-at-all' strategy immediately prior to" the jury charge. State Habeas Record at 193. Freeman said: "I reluctantly acquiesced to [Slater's]

---

[11]     Article 38.36(a) provides that "in all prosecutions for murder, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense."

[12]     The Court of Criminal Appeals had previously found that the prior version of that statute applied in capital-murder prosecutions. *See Sattiewhite v. State*, 786 S.W.2d 271, 283 (Tex. Crim. App. 1989); *Purtell v. State*, 761 S.W.2d 360, 370 (Tex. Crim. App. 1988); *Lamb v. State*, 680 S.W.2d 11, 17 (Tex. Crim. App. 1984).

[13]     Freeman passed away before providing another affidavit.

apparently sober decision to 'roll the dice' on the issue of his guilt without any lesser included offense at all in the trial court's final charge." State Habeas Record at 194. Freeman said that Slater's decision "was made after I fully explained to him the legal consequences of his election . . . privately in the open trial courtroom." State Habeas Record at 194. Freeman further said that Slater's "surprise, albeit express, election was, moreover, solely *his* election." State Habeas Record at 194.

Over a decade later, Slater added a stronger factual basis to his habeas claim through his own affidavit. Slater stated:

> There are several factual inaccuracies I want to point out. Much of it is based on what Mr. Freeman told me was the best trial strategy.
>
> My defense was self defense. The offense involved what was to have been a drug deal. While we were negotiating in my car one of the men pulled a pistol and began shooting. Numerous shots were exchanged and two men were killed. I pulled my gun only after the shooting began. I was in fear of my life when I began shooting.
>
> After all of the evidence was presented at the guilt/innocence stage of the trial I had a long discussion with Mr. Freeman in the courtroom. I did not understand everything he said but he told me that we should go for all or nothing that is we should ask the jury to decide whether I had committed capital murder and not ask that any other charges be submitted to the jury. Mr. Freeman told me that if we allowed the jury to consider other charges they probably would compromise and convict me of murder. Mr. Freeman told me the jury could consider self defense if the capital murder was the only charge submitted to the jury. He told me I stood a better chance of being acquitted if the jury had to decide only if I was guilty of capital murder or innocent.
>
> I agreed to go along with what Mr. Freeman suggested. I am not a lawyer and he had much more experience than I did. I did not fully understand what he told me and would never have agreed to his strategy if I had known that there is no self defense in a robbery-murder prosecution. My defense was self defense. I shot only to protect myself.

State Habeas Record at 604.

The state habeas court eventually signed factual findings and legal conclusions recommending

that the Court of Criminal Appeals deny relief. With the conflicting affidavit testimony, the state habeas court faced a question of whether Freeman or Slater's affidavit was credible. The state habeas court found "not credible the assertions in [Slater's] habeas affidavit submitted more than twelve years after the trial and many years after trial counsel's death in which [he] claims that he wanted to testify and that trial counsel, not [Slater], wanted to go for all or nothing." State Habeas Record at 1095. In contrast, the state habeas court premised its decision on "the credible affidavit of trial counsel Charles Freeman." State Habeas Record at 1047.[14]

With that endorsement, the Court of Criminal Appeals issued factual findings accepting Freeman's account that Slater "surprisingly albeit expressly elected to pursue an all-or-nothing-at-all strategy" and that Freeman "reluctantly acquiesced to [Slater's] apparently sober decision to roll the dice on the issue of his guilt without any lesser included offense at all in the trial courts final charge." State Habeas Record at 1094.[15] The state habeas court found that Freeman "fully explained the legal consequences of [Slater's] decision." State Habeas Record at 1094. Also, Freeman's "jury argument concerning the alleged lack of evidence to show that the shooting occurred during the course of a robbery reflects [Slater's] express decision to roll the dice by not requesting a charge on a lesser-included offense." State Habeas Record at 1095 (citing Tr. Vol. 17 at 73-89). With those predicate facts, the state habeas court found that Freeman was "not ineffective for deferring to

---

[14]     The state habeas court bolstered its decision that Freeman's affidavit by relying "on its familiarity with trial counsel Freeman's trial demeanor and advocacy in cases other than the instant case over which the Court did not preside" and found "that trial counsel Freeman was a zealous advocate of his clients interest who would often engage in a trial strategy of bluff and bluster consistent with trial counsels' advocacy of a self-defense instruction in the instant case." State Habeas Record at 1095. The state habeas court also relied on Freeman's other "vigorously represent[ation]" with regard to Slater's "interest in the preparation of the guilt-innocence jury charge by making" numerous other suggestions and objections. State Habeas Record at 1048.

[15]     Slater "would have been entitled to a charge on the lesser offense of murder and the defensive charge of self defense if they had been requested." State Habeas Record at 1062.

[Slater's] wishes and not requesting a jury instruction on the lesser-included offense of murder" after "counsel explained the legal consequences." State Habeas Record at 1095, 1110.

### 4.    Federal Review

The operation of AEDPA guides the reasoning and result of federal review. This Court must presume correct all state court findings unless Slater rebuts that presumption with "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Slater's burden in refuting the legal conclusions is not light. He must show that they were "contrary to, or an unreasonable application of, federal law." 28 U.S.C. § 2254(d)(1). Slater must also rebut any factual findings by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Slater challenges the state court judgment by arguing that Freeman's affidavit was not credible, that a reasonably competent attorney would not have allowed his client to participate in the decision whether to rely on the all-or-nothing defense, that Slater lacked the intellectual capacity to assess the consequences of that decision, and that Freeman should not have deferred to Slater's wishes.

Slater's challenge to the state court judgment first disputes the explicit factual findings relating to Freeman's credibility. In an attempt to overcome the deference to the state court findings, Slater has submitted new evidence that arguably tends to impugn Freeman's character and discount his affidavit.[16] Under Supreme Court precedent, however, a federal habeas petitioner "must [meet the AEDPA standard] on the record that was before the state court." *Pinholster*, 563 U.S. at 185; *see also Clark v. Thaler*, 673 F.3d 410, 417 (2012) (applying *Pinholster* and concluding that the federal court

---

[16]    Slater primarily relies on: (1) an affidavit Freeman submitted in a different case explaining that a trial attorney should make most trial decisions and (2) an affidavit from a state trial judge opining that Freeman was not a competent, honest, or ethical attorney. (Docket Entry No. 21 at 22-24).

must "consider only the record that was before the state habeas court").[17] Slater's new evidence has no bearing on federal review. Because Slater has not otherwise rebutted the factual findings relating to Freeman's affidavit, this Court must presume correct his credible statement that he informed Slater of his options before Slater chose the all-or-nothing approach.

Slater argues that "[r]easonably competent counsel would have requested instructions on murder and self-defense and would not have allowed his client to participate in, much less veto, that decision." (Docket Entry Np. 21 at 39). Underlying Slater's argument is the presumption that the all-or-nothing approach could not be a reasonable strategy in this case. The Fifth Circuit has found that a trial counsel's decision to pursue an "all-or-nothing strategy was not objectively unreasonable," even when lesser-included-offense instructions were available. *See Druery v. Thaler*, 647 F.3d 535, 540 (5th Cir. 2011) (finding that even if his judgment was mistaken). The Texas Court of Criminal Appeals has found that a defense attorney does not act deficiently in failing to request a lesser included offense if he was pursuing an all-or-nothing trial strategy. *See Ex Parte White*, 160 S.W.3d 46, 55 (Tex. Crim. App. 2004). Although choosing to forgo a lesser-included-offense instruction makes jurors choose between conviction and an acquittal is "risky," it "is sometimes successful." *Lynn v. State*, 860 S.W.2d 599, 603 (Tex. App. 1993).

Slater argues that "an acquittal on self-defense was a much more likely result than an outright

[17]   Slater argues that this Court should consider his new evidence because his state habeas counsel provided ineffective representation under *Martinez v. Ryan*, 566 U.S. 1 (2012), by not adducing the new evidence he includes in this federal habeas action. "*Martinez* does not apply to claims that were fully adjudicated on the merits by the state habeas court because those claims are, by definition, not procedurally defaulted." *Escamilla v. Stephens*, 749 F.3d 380, 394 (5th Cir.2014). Because "[t]he Texas courts adjudicated [Slater's ineffective-assistance] claim on the merits . . . *Martinez* and *Trevino* are inapposite." *Villanueva v. Stephens*, 619 F. App'x 269, 276 (5th Cir. 2015); *see also Allen v. Stephens*, 619 F. App'x 280, 290 (5th Cir. 2015). "Thus, once a claim is considered and denied on the merits by the state habeas court, *Martinez* is inapplicable, and may not function as an exception to *Pinholster*'s rule that bars a federal habeas court from considering evidence not presented to the state habeas court." *Escamilla*, 749 F.3d at 395.

20

acquittal under an 'all-or-nothing' strategy based on a reasonable doubt that [Slater] committed robbery." (Docket Entry No. 35 at 11). Slater's police statement in isolation may have raised the possibility of both defenses, but the State's strong evidence (including eyewitness testimony and forensic evidence) refuted Slater's version of events. Slater has not shown that a reasonable trial attorney could not try to disprove the robbery element, possibly resulting in an acquittal, when the self-defense instruction would not have been based on any stronger testimony.

True, the all-or-nothing strategy eventually excluded the possibility of self-defense. Freeman understood the implications of that strategy.[18] But even after Slater made his decision, Freeman zealously argued for the inclusion of a self-defense instruction. Slater now argues that "[a]ny competent criminal defense lawyer would have understood this simple legal concept and would not have requested an instruction on self-defense without also requesting an instruction on murder." (Docket Entry No. 21 at 32). The trial court, however, did not find the issue so simple, and recessed the proceedings to allow the parties to research the issue. Tr. Vol. 17 at 24-26, 31-37. Only after research and substantial discussion did the trial court ultimately refuse to include an instruction on self-defense.[19]

Slater argues that a reasonable attorney would not have allowed his client to make the decision whether to pursue an all-or-nothing defense. "[C]ategorization of decisions as the personal choices of a criminal defendant or the tactical choices of counsel is not always an easy task . . . ." *Autry v.*

---

[18]      Slater's arguments presuppose that Freeman did not know that the trial court would refuse a self-defense instruction until after he consulted with Slater about the all-or-nothing approach. (Docket Entry No. 35 at 5). The record shows that early in the case Freeman knew the trial court's position on the relationship between lesser-included offenses and self-defense early in the trial. Tr. Vol. 4 at 149-50. Even then, the trial court allowed significant discussion and research on the issue. Tr. Vol. 17 at 25-26.

[19]      State habeas counsel argued that the trial court committed legal error by denying the instructions. State Habeas Record at 5, 28, 32-34.

*McKaskle*, 727 F.2d 358, 362 (5th Cir. 1984). Some decisions such as whether to plead guilty, whether to testify, whether to waive a jury trial, or whether to take an appeal are so fundamental to a defense that they cannot be made by counsel, but must be made by the defendant himself. *See Jones v. Barnes*, 463 U.S. 745, 751 (1983). Aside from those decisions belonging to the client, Slater has not shown that a trial attorney should not allow his client to participate in other tactical decisions. Slater has not provided any law showing that counsel is constitutionally ineffective for presenting potential defensive strategies, such as requesting lesser-included-offense instructions, to his client.

Still, Slater argues that the trial court "failed to consider as a threshold matter whether [he] was even capable of understanding such a decision." (Docket Entry No. 21 at 37).[20] The record shows that Freeman explained the available options to Slater, but Freeman was not sure that it was "an informed decision on his part" or that he "under[stood] the consequences of that decision." Tr. Vol. 17 at 6. After another short recess Freeman apparently indicated that Slater chose not to request a lesser-included-offense instruction, but Freeman did not provide any detail about Slater's understanding of that decision. Slater argues that he lacked the mental acumen to make decisions about his case because: he was illiterate, he could not understand the difference between capital murder and simple murder, he had previously experienced a head injury and possibly had organic brain damage, he had a IQ of 63 or in the "dull normal range," he functioned on a fourth or fifth-grade level, and had a learning disorder. With those deficiencies, Slater argues that "[r]easonably competent counsel would not allow an uneducated, intellectually limited client to make the critical life-or-death decision of how the court should instruct the jury on the law." (Docket Entry No. 21 at 38).

---

[20]    Slater did not ask the state courts to consider whether his instructions to counsel were informed, knowing, or voluntary.

The law is clear that a competent defendant's "directions [are] entitled to be followed." *Lowenfield v. Phelps*, 817 F.2d 285, 292 (5th Cir. 1987); *see Roberts v. Dretke*, 356 F.3d 632, 638 (5th Cir. 2004); *Autry*, 727 F.2d at 362. Slater has not provided briefing that comprehensively clarifies the competency standard for making trial decisions, much less pointed to law requiring that such decisions be knowing and voluntary.[21] In similar a context, the Supreme Court has been wary to impose an informed and knowing requirement on a defendant's decision. *See Schriro v. Landrigan*, 550 U.S. 465, 479 (2007) (refusing to impose that standard on a defendant's decision not to present mitigating evidence). In other cases, the Fifth Circuit has found no ineffective representation when counsel follows his client's "informed decision." *Brawner v. Epps*, 439 F. App'x 396, 401 (5th Cir. 2011); *Dowthitt v. Johnson*, 230 F.3d 733, 748 (5th Cir. 2000); *see also Autry*, 727 F.2d at 362 ("If Autry knowingly made the choices, [his lawyer] was ethically bound to follow Autry's wishes.").

The record suggests that Slater was not highly intelligent. However, Slater has not shown that he could not understand the legal pathways ahead of him, particularly after counsel's lengthy discussion with him. A pre-trial psychological evaluation did not "reveal any evidence of a mental disease or mental defect on or about the time of the alleged offense." Clerk's Record at 23. A competency evaluation found that Slater understood the rudimentary concerns of his criminal trial. Clerk's Record at 26. Slater's history contained mixed evidence of low intelligence, Clerk's Record at 26, but a pretrial competency evaluation found that testing "fail[ed] to reveal any evidence of a mental disease or mental defect of sufficient severity to prohibit Mr. Slater from standing trial at the

---

[21]   Slater faults the trial court for not "admonishing [him] on the record to ensure that the decision . . . was knowingly, voluntarily, well-informed, and fully understood," but does not point to any law placing that requirement on a trial court. (Docket Entry No. 35 at 8).

present time. Mr. Slater demonstrates the ability to consult with his attorney with a reasonable degree of rational understanding and he demonstrates both a rational and a factual understanding of the legal proceedings against him." Clerk's Record at 27.   A post-trial psychological evaluation "mirror[ed] the information in the State's file" that showed that Slater's "memory was intact; his attention and abstract thinking was normal; he was cooperative; he was oriented to person, place, and situation . . . his insight was good concerning his legal predicament." State Habeas Record at 1093.[22]   The state habeas court expressly found that counsel "fully explained the legal consequences of [Slater's] decision."   State Habeas Record at 1094.   Slater has not shown that he did not understand the explanation. As Slater was "master of his own defense," *Moore v. Johnson*, 194 F.3d 586, 606 (5th Cir. 1999), his trial attorney cannot be found ineffective for following his wishes. *See Faretta v. California*, 422 U.S. 806, 820 (1975) ("The counsel provision . . . speaks of the 'assistance' of counsel, and an assistant, however expert, is still an assistant.").

"Cutting through the smoke, it is apparent that [this Court is] being asked to permit a defendant to avoid conviction on the ground that his lawyer did exactly what he asked him to do. That argument answers itself." *United States v. Masat*, 896 F.2d 88, 92 (5th Cir. 1990).   Slater has not shown that Freeman provided deficient performance relating to the discussion of, and acceptance of his wishes concerning, trial tactics.

### 5.    Prejudice

The state habeas court did not make any explicit findings about whether Freeman's

---

[22]    In the pre-trial evaluation, the psychologist observed: "Mr. Slater indicated that he is currently charged with capital murder. When asked if he knows the difference between capital murder and murder he stated 'no, sir.' When asked if capital murder is worse than murder he stated 'I don't know.'" Clerk's Record at 23.  Slater may not have known the difference between capital and simple murder in the initial stages of trial.  That, however, does not mean he did not, much less that he could not, later in trial, especially with counsel's assistance.

representation with regard to the lesser-included-offense instructions prejudiced the defense. Slater argues that the Court must consider the issue *de novo*. Generally, "[w]hen a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits." *Johnson v. Williams*, 133 S. Ct. 1088, 1096 (2013); *see also Harrington v. Richter*, 562 U.S. 86, 98-99 (2011). Whether under a *de novo* or AEDPA review, however, Slater has not shown a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Slater's prejudice argument presumes that defenses based on self-defense and robbery would have created a reasonable probability of a different result. While not in the context of a *Strickland* claim, the Court of Criminal Appeals considered the viability of the Slater's proposed defenses. On direct appeal, Slater argued that the evidence was legally insufficient to support the jury's verdict which required finding that he had committed a robbery. The Court of Criminal Appeals surveyed the evidence and found as follows:

> The evidence at trial was consistent only with a scheme by [Slater] and his accomplice to rip off the victims who were misled into believing they were going to purchase drugs from [Slater]. A rational trier of fact could conclude from Washington's testimony that the accomplice's exit from one side of the car and [Slater's] positioning of himself near the other side and then their simultaneously shooting at the victims in the back seat was/evidence of a premeditated robbery/murder. A rational jury could also conclude [Slater] and/or his accomplice hurriedly took nearly all of the $3000 from victim Andrew's body before fleeing the scene. There was no evidence at trial introduced supporting [Slater's] claim he fired only after one of the victim's first pulled a gun. First, no weapons were found at the scene. Second, several of the wounds were to the victim's backs. Third the slugs recovered during the autopsies were from two different guns supporting Washington's testimony appellant and Julius Woods together shot the victims. Fourth, there was no physical evidence supporting [Slater's] claim such as bullet holes in the car wash where the offense took place or on the outside of [Slater's] car that Washington fired several shots at [Slater] and Woods. Finally [Slater's] claim that the $2800 was actually blown away by the wind is weak. It is unlikely the two small stacks totaling $200 which were found near

Andrews body would remain in place while the much larger wad of cash totaling $2800 somehow blew away.

Opinion on Direct Appeal at 35. The Court of Criminal Appeals found that "a rational jury could conclude [Slater] killed the victims as part of a premeditated robbery." Opinion on Direct Appeal at 35. Further, the Court of Criminal Appeals addressed Slater's argument that he shot the victims in self-defense:

> In the instant case there were no defense witnesses. The only evidence introduced favorable to [Slater] was the portion of his own videotaped statement in which he claims he shot the victims in self-defense or, alternatively, Eric Washington was involved in the shootings. None of the physical evidence or other evidence introduced at trial supported [Slater's] claim he acted in self-defense or that Eric Washington fired any shots either at [Slater] or at the victims.

Opinion on Direct Appeal at 35. The Court of Criminal Appeals concluded: "[Slater's] unsupported claim of self-defense was inconsistent with the physical evidence found at the scene of the offense." Opinion on Direct Appeal at 36.[23]

While the language quoted above addressed claims brought under different legal standards from that before the Court, the logic leads to the same conclusion: no reasonable probability of a different result flows from counsel's allegedly deficient performance. As the state courts extensively discussed, Slater's police statement provided a framework from which to argue that Slater did not rob or intend to kill the victims, but the physical evidence and eyewitness testimony created a much stronger case that Slater committed capital murder. Under either a *de novo* or deferential AEDPA standard, Slater has not shown a reasonable probability of a different result had trial counsel

---

[23]     The state habeas court observed that the Court of Criminal Appeals found that the evidence was "legally and factually sufficient to establish that [Slater] committed murder during the course of committing or attempting to commit robbery" and "there was no evidence supporting [Slater's] claim that he fired only after one of the victim's pulled a gun." State Habeas Record at 1098. The state habeas court summarized this finding on habeas review: "the evidence did not support [Slater's] claim that he acted in self-defense and [his] unsupported claim of self-defense was inconsistent with the physical evidence found at the scene of the offense." State Habeas Record at 1098.

performed differently.  This claim is denied.

### B.    Organic Brain Impairment and Learning Disabilities (Claim Two)

Slater's mother was the only defense witness called in the penalty phase.  Slater's mother

testified that a car hit Slater when he was five years old, which resulted in a head injury requiring

surgery.  Slater's mother also explained that he had an IQ of 63, functioned on a fourth- or fifth-grade

level, and did not do well academically.  Tr. Vol. 21 at 85-87.  In closing, Freeman encouraged jurors

to consider the circumstances of the crime in the context of Slater's low IQ.  Tr. Vol. 21 at 141-42.

The prosecutor, however, argued in closing that a low IQ and head injury did not mitigate against a

death sentence.  Tr. Vol. 21 at 148.

Slater faults Freeman for not investigating and presenting additional evidence of his learning

disabilities and possible organic brain damage.  Slater argues that a deeper investigation into his

juvenile history would have revealed mitigating evidence of mild mental retardation and a possible

chronic organic brain disorder.  State Habeas Record at 47.  In doing so, Slater relies on three primary

sources of information.[24]  First, psychologist Dr. Walter Y. Quijano who performed an evaluation in

1998 in which he found a "[p]ersonality change due to head injury; disinhibited and aggressive type."

State Habeas Record at 101.  Dr. Quijano also observed a "cognative disorder" and a "learning

disorder," but provided few other details.  State Habeas Record at 101.  Dr. Quijano recommended

a "neurological and neuropsychological work up to measure current brain disorder and dysfunctions."

State Habeas Record at 102.

---

[24]        Slater presents additional information on federal habeas review.  As previously discussed, federal habeas review
"focuses on what a state court knew and did," *Pinholster*, 563 U.S. at 182.  Reasoning that "[i]t would be strange to ask
federal courts to analyze whether a state court's adjudication resulted in a decision that unreasonably applied federal law
to facts not before the state court," *Pinholster* explicitly held that "[i]f a claim has been adjudicated on the merits by a
state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that
state court." *Id.* at 185.

Second, Dr. John Largen performed a neuropsychological evaluation in 1991 which discussed Slater's head injury,[25] revealed a Full Scale I.Q. score of 77, recognized impairments in memory and academic functioning, and concluding that testing results were "commensurate with the presence of organic brain impairment." State Habeas Record at 292.[26]   The possibility of organic brain impairment "raise[d] the possibility of disinhibitory control over emotional reactions and possibly organic based impulsive behavior." State Habeas Record at 292.

Third, Slater's mother provided an affidavit saying that Freeman never asked about Slater's head injury or his educational problems. State Habeas Record at 606-07. Slater's mother attached to her affidavit Houston Independent School District (HISD) reports showing that at age twelve Slater was functioning on a second- or third-grade level in reading, spelling, language, and math. State Habeas Record at 610-23.

The state habeas court's adjudication of this claim hinged on an affidavit Freeman submitted that explained his approach to the mitigating evidence: "It was then and remains now, though my professional opinion that [Slater's] mental dysfunction was a double-edged sword that simultaneously tended to both ameliorate his blameworthiness for the charged offense and indicate that he was, indeed, likely to be a continuing threat to society." State Habeas Record at 197. Freeman "advised [Slater] that evidence of his mental dysfunction could be considered by a jury as either mitigating or aggravating . . . ." State Habeas Record at 275.

---

[25]      Dr. Largen noted that "[m]edical history includes his being struck by a car at age 5 years resulting in a head injury and neurosurgery, but details of the accident were lacking. The patient manifests a jagged scar on his left forehead which extends toward to the vertex and resulted from the above car accident." State Habeas Record at 288.

[26]      The state habeas court generally referred to Dr. Largen's report as "the Orchard Creek Hospital Records." State Habeas Record at 1088.

The state habeas court found that Freeman adequately investigated evidence of Slater's possible mental-health issues and learning disability.  The state habeas court found that Slater's psychological records were available in the State's file, which Freeman examined.  State Habeas Record at 1086, 1088-89.[27]  While Slater argues that additional investigation would have produced greater evidence of organic brain impairment and learning difficulties, Slater relies on evidence that differs only in detail, not in mitigating thrust, from that available to counsel.

With counsel's access, and apparent use, of those records, the state habeas court endorsed Freeman's decision not to pursue a defense based on mental dysfunction.  The state habeas court found that "most of the information in the records is either more harmful than beneficial to [Slater] or consists of non-mitigating evidence."  State Habeas Record at 1086.  For instance, the Orchard Creek Hospital records stated that it "would be considered difficult to effect serious change in [Slater's] behavior inasmuch as he denies altogether the behavior of which he is charged and insists that his only problem is attitude of anger toward certain other people."  State Habeas Record at 1089.  Because the Orchard Creek Hospital records "produced mixed results," the state habeas court found that Freeman was not ineffective for putting them before the jury.  State Habeas Record at 1099.  Likewise, information about Slater's "mother's claim that his childhood accident prevented him from progressing academically" conflicted with other information in the record suggesting "that his actions

---

[27]     The defense investigated mental-health issues before trial.  For example, Freeman filed a motion for the assistance of a "behavioral scientist."  Clerk's Record at 13.  The trial court did not rule on that motion immediately. Subsequently, Dr. Edward Silverman met with Slater to assess his sanity and competency.  Clerk's Record at 22-27. Relying on clinical interviews and records, Dr. Silverman found Slater competent to stand trial and sane.  Clerk's Record at 22-27.  In reviewing his background, Dr. Silverman's report mentioned a head injury Slater had suffered at age five when he was hit by a car.  Dr. Silverman's report also acknowledged prior IQ scores ranging from 63 to 80.  Dr. Silverman concluded that there was no "evidence of a mental disease or . . . defect . . . of the type, nature, or severity to prohibit Mr. Slater from knowing whether or not the alleged behavior was wrong."  Clerk's Record at 23.  After Dr. Silverman issued his report, the trial court told the defense it would grant funds for a behavioral scientist if provided more information.  Tr. Vol. 3 at 57.  The defense did not retain an expert to evaluate Slater for organic brain damage.

and behavior were by choice rather than controlled by a childhood head injury." State Habeas Record at 1091. Thus, Freeman did not "introduc[e] . . . available educational, health, and juvenile records" as a "a reasonable trial decision based on . . . records which contained a history of violence juxtaposed with an intelligence range that precluded [Slater] from being considered mentally retarded and which showed an apparent ability to conform his behavior if he desired." State Habeas Record at 1092.

The Fifth Circuit has held that the decision to forego presenting "double-edged" evidence is a reasonable trial strategy. *See Rodriguez v. Quarterman*, 204 F. App'x 489, 500 (5th Cir. 2006) (finding the decision to forego presenting double-edged evidence regarding petitioner's permanent brain damage was reasonable since it could have bolstered the State case regarding future dangerousness); *Hopkins v. Cockrell*, 325 F.3d 579, 586 (5th Cir. 2003) (holding "that a tactical decision not to pursue and present potentially mitigating evidence on the ground that it is double-edged in nature is objectively reasonable"); *Mann v. Scott*, 41 F.3d 968, 984 (5th Cir. 1994) (noting the heavy deference owed trial counsel when deciding as a strategical matter to forego admitting evidence of a 'double-edged nature' which might harm defendant's case). In particular, the Fifth Circuit has held that evidence of organic brain injury presents a "double-edged" sword, and "deference is accorded to counsel's informed decision to avert harm that may befall the defendant by not submitting evidence of this nature." *Martinez v. Dretke*, 404 F.3d 878, 889 (5th Cir. 2005) (citing *Kitchens v. Johnson*, 190 F.3d 698, 703 (5th Cir.1999)). A juror could see some mental conditions only as aggravating because they increase the likelihood that a defendant will act violently again. *See Nelson v. Quarterman*, 472 F.3d 287, 307-08 (5th Cir. 2006). As the Seventh Circuit has noted, sentencers "may not be impressed with the idea that to know the cause of viciousness is to excuse it; they may conclude instead that when violent behavior appears to be outside the defendant's power

30

of control, capital punishment is appropriate to incapacitate." *Foster v. Schomig*, 223 F.3d 626, 637 (7th Cir. 2000) (quotation omitted). Thus, the "introduction of evidence that [a defendant] suffered from organic (i.e., permanent) brain damage, which is associated with poor impulse control and a violent propensity, would have . . . increased the likelihood of a future dangerous finding." *Martinez*, 653 F. App'x at 321. Accordingly, "counsel's decision not to introduce evidence of neurological impairment (i.e., organic brain damage) as mitigating evidence at the punishment phase constituted reasonable and protected professional judgment" because evidence of organic brain injury is a "double-edged sword." *Id.* at 887-90.

The state habeas court found no deficient performance in Freeman's handling of brain-injury and learning-difficulty evidence. Given the strong deference afforded Freeman's strategic decisions, the state habeas court's endorsement of his decision not to pursue additional mitigating evidence was not unreasonable.[28] This claim is denied.

### C.      Closing Arguments (Claim Three)

Slater argues that Freeman provided ineffective representation in the penalty-phase closing arguments. In a unique procedure, closing summation in this case proceeded with the defense arguing first, followed by the State, followed then by a rebuttal from the defense, and ending with a final statement by the State. Slater faults Freeman for "criticizing the jury during summations for being rude, arrogant, and unwilling to analyze the evidence critically." (Docket Entry No. 21 at 53). Slater did not raise any related *Strickland* claim on state habeas review. To overcome the resultant procedural bar, Slater argues that state habeas counsel provided ineffective representation by not

---

[28]      The state habeas court did not render an express finding on prejudice. This Court's review of the trial and the evidence Slater presented on state habeas review does not suggest a reasonable probability of a different result had counsel prepared a different punishment-phase defense.

raising a claim challenging Freeman's closing summation.

### 1.   Ineffective-Assistance-of-Habeas-Counsel Standard

Without elaboration, Slater argues that deficiencies in his habeas counsel's representation allow him to overcome the procedural bar of his ineffective-assistance claims under *Martinez v. Ryan*, 566 U.S. 1 (2012). Under *Martinez*, Slater must show cause and actual prejudice from habeas counsel's representation. In the ineffective-assistance-of-habeas-counsel context, the cause test uses the *Strickland* standard. *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) (to show cause "[n]ot just any deficiency in counsel's performance will do, however; the assistance must have been so ineffective as to violate the Federal Constitution"); *Murray v. Carrier*, 477 U.S. 478, 492 (1986) ("Attorney error short of ineffective assistance of counsel does not constitute cause[.]"). To meet the *Strickland* standard in the habeas-counsel context, the petitioner must do more than identify issues or claims that habeas counsel did not raise and are now barred. *See Hittson v. GDCP Warden*, 759 F.3d 1210, 1265 (11th Cir. 2014) ("generalized allegations are insufficient in habeas cases" to meet the *Martinez* exception); *Smith v. Murray*, 477 U.S. 527, 535 (1986) ("[T]he mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default."). A state habeas attorney "need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal" because "counsel cannot be deficient for failing to press a frivolous point." *Vasquez v. Stephens*, 597 F. App'x 775, 779 (5th Cir. 2015) (quotations omitted).

Under *Martinez*, a petitioner may meet the cause element by showing "(1) that his claim of ineffective assistance of counsel at trial is substantial–*i.e.*, has some merit–and (2) that habeas counsel was ineffective in failing to present those claims in his first state habeas proceeding." *Garza v.*

*Stephens*, 738 F.3d 669, 676 (5th Cir. 2013). A federal court's focus is on state habeas counsel's

representation. *See Matthews v. Davis*, 665 F. App'x 315, 317-18 (5th Cir. 2016); *Martinez v. Davis*,

653 F. App'x 308, 318 (5th Cir. 2016); *Trevino v. Davis*, 829 F.3d 328 (5th Cir. 2016). To show that

state habeas counsel's deficiency resulted in actual prejudice, a petitioner must show harm to his case

"significantly greater than that necessary" to establish plain error on direct review. *Carrier*, 477 U.S.

at 493-94. In this circuit, "actual prejudice" requires the petitioner to "establish not merely that the

errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial

disadvantage, infecting his entire trial with error of constitutional dimensions." *Moore v. Quarterman*,

534 F.3d 454, 463 (5th Cir. 2008); *see also Hernandez v. Stephens*, 537 F. App'x 531, 542 (5th Cir.

2013); *Barrientes v. Johnson*, 221 F.3d 741, 769 (5th Cir. 2000). "Prejudice . . . means that [a

petitioner] must show a reasonable probability that he would have been granted state habeas relief had

his habeas counsel's performance not been deficient." *Martinez*, 653 F. App'x at 318.

### 2.     Freeman's Summation

Slater contends that Freeman provided ineffective assistance by delivering a closing argument

that "criticiz[ed] the jury . . . for being rude, arrogant, and unwilling to analyze the evidence

critically." (Docket Entry No. 53). A defense attorney's closing arguments are subject to the

*Strickland* standard. *See Bell v. Cone*, 535 U.S. 685, 697 (2002). Before assessing the tone and tenor

of his arguments, the Court observes that Freeman never provided a justification for his tense,

rambling closing argument. "Although courts may not indulge 'post hoc rationalization' for counsel's

decisionmaking that contradicts the available evidence of counsel's actions, neither may they insist

counsel confirm every aspect of the strategic basis for his or her actions." *Richter*, 562 U.S. at 109

(quoting *Wiggins*, 539 U.S., at 526-27). There is a "strong presumption" that counsel's attention to

33

certain issues to the exclusion of others reflects trial tactics rather than "sheer neglect." *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003). "[C]ounsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage." *Id.* at 5-6. "Judicial review of a defense attorney's summation is therefore highly deferential . . . ." *Id.* at 6. This Court must "examine the closing argument in its entirety." *Jennings v. Stephens*, 617 F. App'x 315, 318 (5th Cir. 2015).

Slater does not complain about Freeman's closing arguments in the guilt/innocence phase. Freeman's summation in that portion of trial was not overly emotional, but followed a logical and consistent theme. Freeman's punishment arguments stand in stark contrast. Freeman began closing arguments by wishing the jury "Good Morning." Tr. Vol. 18 at 118. Jurors must not have responded, because counsel then launched into an emotionally charged lecture against arrogance and incivility.

At the beginning, Freeman's arguments seemed to reflect little more than an emotional response to a perceived personal slight by jurors. Freeman said that he initially did not intend his argument to take an emotional turn. Tr. Vol. 21 at 122.[29] Evaluating the jury's demeanor toward him, and apparently fearing that the guilt/innocence decision was based on emotion, Freeman perceived

---

[29]      Freeman apparently changed his approach upon assessing the jury's demeanor. Freeman explained that he "took it very personally that [jurors] would not respond to a greeting," because it indicated to him "that there was some problem," and more specifically a problem with "the manner in which [jurors] handled the evidence at the innocence and guilt phase of trial." Tr. Vol. 21 at 139. The fact that Freeman changed tactics on his feet is not necessarily a concern. The Supreme Court has "recall[ed] the words of Justice (and former Solicitor General) Jackson: 'I made three arguments of every case. First came the one that I planned–as I thought, logical, coherent, complete. Second was the one actually presented–interrupted, incoherent, disjointed, disappointing. The third was the utterly devastating argument that I thought of after going to bed that night.'" *Gentry*, 540 U.S. 8-9 (quoting Advocacy Before the Supreme Court, 37 A.B.A.J. 801, 803 (1951)).

the need to make harsh emotional appeals. Tr. Vol. 122.[30] As he started, Freeman's language on the cold record generally comports with Slater's description – arrogant, condescending, and possibly insulting. As the closing statement continued, however, Freeman tempered his tone, his intent became clearer and he loosely followed a cohesive theme. Freeman began with an emotional appeal intended to unsettle jurors for not being "civilized" and for becoming "arrogant judges of Slater." Tr. Vol. 21 at 119, 120. Freeman's intent became more obvious as he asked "How can a person judge another until he himself allows himself to be put in a position to be judged by another?" Tr. Vol. 21 at 120. With that predicate, Freeman summarized the intent of his harangue: "I'd ask [jurors] that this time be careful because the stakes are high. This time be very cautious because the conclusions could be fatal." Tr. Vol. 21 at 125. Arguing that the jury unfairly judged his client, particularly in light of his low IQ, Freeman's initial statement chided them for finding Slater guilty.

The State's responsive argument characterized Freeman's approach not as an insulting rant, but as an attempt to put jurors on a "guilt trip." Tr. Vol. 21 at 128.[31] The State perceived counsel's discussion about the failure to return a greeting as setting the jury up to feel too guilty to return a

---

[30]     Freeman stated:
        I thought I wouldn't have to do a bunch of selling. I thought all I would have to do is maybe argue the case based on the evidence that was presented and rely on your assurances that you would be careful, that you would be cautious, that you would use those same engineering and medical and mathematical minds to evaluate this evidence. That's what I expected. I surely didn't get it. And I know I didn't get it.

Tr. Vol. 21 at 122.

[31]     The prosecutor stated:
        Mr. Freeman is trying to make you feel guilty because you didn't give him some kind of sufficient greeting. That's the icing on the cake of the real guilt trip. The guilt trip is really going to be I suggest to you he's going to get up here before you and tell you that you are killing that boy there that you are killing that young man. Honestly and truly we're not asking you to kill anybody. We're just asking you to answer three special issues.

Tr. Vol. 21 at 128-29.

death-eligible verdict. Tr. Vol. 21 at 128-29. The prosecutor argued: "He wants to make you feel bad because you didn't greet him appropriately or you didn't stay out long enough or didn't render the type of verdict he wanted. Forget the guilt trip." Tr. Vol. 21 at 130.

The defense's second closing argument returned to the earlier theme, but without vitriol and with a focus on getting jurors to follow their "own personal guidance." Tr. Vol. 21 at 138. Freeman explained to jurors: "We have to wake ourselves up . . . especially as judges the highest position that a citizen can have, to literally judge another man or woman's life. That is a very high station. It's not something to be taken lightly and all I suggest that you do is to make certain at the time you are" following the voice of personal conscience. Tr. Vol. 21 at 138. With that, Freeman urged jurors to return to "how they handled the evidence at the innocence and guilt phase of trial." Tr. Vol. 21 at 139. Freeman encouraged jurors to reassess whether there was an "actual robbery in order to say that there was capital murder, because without robbery there was no capital murder. . . . Look at it carefully. That's what I'm asking you to do." Tr. Vol. 21 at 142.

Freeman's closing was not perfect, and definitely not the strategy other attorneys may have adopted. "To be sure, [Slater's] lawyer was no Aristotle or even Clarence Darrow." *Gentry*, 540 U.S. at 11. Still, the state habeas court's finding that Freeman "was a zealous advocate of his client's interest who would often engage in a trial strategy of 'bluff and bluster'" accurately described his closing argument. State Habeas Record at 1095.[32] Freeman never provided a roadmap to any strategic basis for his argument, but Slater fairly describes part of his summation as "criticizing jurors

---

[32]     Freeman's punishment summation in this case is consistent with one in which a state appellate court noted that he "spent an inordinate amount of time lecturing the jury; and asked, without focus, about jurors' 'personal experiences' that might adversely affect his client . . . ." *Thomas Lee Jones v. State*, No. 01-90-00460-CR, 1995 WL 397045, at *8 (Tex. App. July 5, 1995). Elsewhere, opinions have chastised Freeman as "abusive, disrespectful, and vituperative," *Vannorsdell v. State*, No. 07-95-0066-CR, 1997 WL 634610, at *1 (Tex. App. Oct. 15, 1997), and described his argument style as "extensive and rambling." *Flakes v. State*, 802 S.W.2d 844, 845 (Tex. App. 1990).

for . . . convicting [him]." (Docket Entry No. 21 at 57). Although Freeman never used the phrase "residual doubt" as a term of art in his closing, his arguments centered on what he considered to be a poor decision by jurors in the guilt/innocence phase, particularly in light of Slater's low IQ. In essence, his emotional language circled around a species of residual doubt and his concluding statements drove that point home.

The choice to revisit the guilt/innocence issues during closing arguments is a strategic one to which courts must defer. *See United States v. Davis*, 285 F.3d 378, 384 (5th Cir. 2002) (finding that an "attack [on] the strength of the government's case as to his guilt" at the punishment phase is "a specific tactical decision"); *Moore v. Johnson*, 194 F.3d 586, 618 (5th Cir. 1999) ("This Court has recognized that, in an appropriate capital case, counsel's decision to rely upon the jury's residual doubt about the defendant's guilt may be not only reasonable, but highly beneficial to a capital defendant."). "Creating lingering doubt has been recognized as an effective strategy for avoiding the death penalty." *Tarver v. Hopper*, 169 F.3d 710, 715-16 (11th Cir. 1999). According to one federal court, studies have shown that residual doubt "is the most powerful 'mitigating' fact. [One study] suggests that the best thing a capital defendant can do to improve his chances of receiving a life sentence has nothing to do with mitigating evidence strictly speaking. The best thing he can do, all else being equal, is to raise doubt about his guilt." *Id.* (quotation omitted).

Freeman's argument, however emotional it may have been, bore the hallmarks of tactics, through only somewhat-focused delivery. The emotional appeal could have turned jurors against Freeman personally, and possibly his client, but it was "precisely the sort of calculated risk that lies at the heart of an advocate's discretion." *Gentry*, 540 U.S. at 9-10 (rejecting ineffective assistance of counsel claim notwithstanding counsels denigration of defendant as a "bad person, lousy drug

addict, stinking thief, [and] jail bird" during closing arguments); *see also Florida v. Nixon*, 543 U.S. 175, 192 (2004) (finding no deficient performance when the attorney conceded that his client was guilty in the guilt phase of a death penalty trial after he had told his client of his plan and not received a response). While a different attorney unquestionably may have come to a different conclusion about the best approach to take in the punishment phase, "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689. "There are countless ways to provide effective assistance in any given case[.]" *Id.*; *see also Pinholster*, 563 U.S. at 189. State habeas counsel could reasonably decide not to raise a claim based on Freeman's punishment-phase summation.

Like other *Strickland* claims, an ineffective-assistance claim focusing on closing arguments still requires a petitioner to show "a reasonable probability that," but for the deficient closing, "the result of the proceeding would have been different." *Smith v. Spisak*, 558 U.S. 139, 154 (2010) (finding that counsel's disparaging comments in penalty phase closing argument portraying client as "sick," "twisted," and "demented" were not sufficient to establish prejudice prong of *Strickland* given nature of the case and counsel's explicit appeal for mercy) (quoting *Strickland*, 466 U.S. at 694). This is not a case where Freeman's conduct was so egregious that it "undermined the proper functioning of the adversarial process" such that "the trial cannot be relied upon as having produced the just result." *Strickland*, 466 U.S. at 686.

With that context, and especially in light of the highly deferential standards afforded counsel's closing argument, a reasonable habeas attorney could forgo challenging Freeman's summation in order to focus the proceedings on more-effective issues. Slater provides little more than a superficial declaration that state habeas counsel should have raised the closing-argument claim. Importantly,

38

Slater has not shown that "he was prejudiced by [state habeas counsel's] deficient performance–that is, that there is a reasonable probability that he would have been granted state habeas relief had the claims been presented in the first state habeas application." *Barbee v. Davis*, 660 F. App'x 293, 314 (5th Cir. 2016); *see also Gates v. Davis*, 648 F. App'x 463, 470 (5th Cir. 2016).  With the heavy deference given Freeman's strategy choices and the operation of *Strickland* prejudice, and mindful that the state habeas court had already opined that Freeman "was a zealous advocate of his client's interest" State Habeas Record at 1095, Slater has not shown a reasonable probability that the state habeas court would have granted relief had counsel advanced this claim.  Accordingly, Slater has not shown that state habeas counsel's representation provides cause and actual prejudice to overcome the procedural bar of this unexhausted claim.[33]

### D.      Appellate Representation (Claim Four)

Slater argues that appellate counsel provided ineffective assistance by not challenging the trial court's instruction on extraneous offenses.  During the punishment phase of trial, the State presented evidence of unrelated offenses and bad acts Slater had committed.  Freeman requested that the jurors only consider those acts after the State had proven beyond a reasonable doubt that he had committed them.  Tr. Vol. 20 at 16-18; Tr. Vol. 21 at 43-44.  Instead, the trial court instructed jurors not to consider extraneous offenses "for any purpose unless you find and believe *by clear evidence* that the defendant committed such other offenses . . . ." Clerk's Record at 76 (emphasis added).  Slater argues that appellate counsel should have challenged the trial court's denial of his proposed instruction.

Slater did not exhaust this claim in state court.  Federal review is barred unless Slater shows

---

[33]      In the alternative, and for the same reasons discussed above, the Court would deny Slater's *Strickland* claim if the merits were fully available for federal review.

cause and prejudice to forgive the resultant procedural default. Slater argues that this Court can reach

the merits because state habeas counsel provided deficient representation under *Martinez* by not

raising the ineffective-assistance-of-appellate-counsel claim. The Fifth Circuit has held that *Martinez*

only forgives the default of ineffective-assistance-of-trial-counsel claims. *See Reed v. Stephens*, 739

F.3d 753, 778 n.16 (5th Cir. 2014). Under Fifth Circuit law, state habeas counsel's representation

cannot forgive the Slater's failure to exhaust this claim.[34]

Even if the *Martinez* exception included ineffective-assistance-of-appellate-counsel claims,

Slater has not shown that his underlying claim has merit. Slater argues that jurors must find beyond

a reasonable doubt that a capital defendant committed an extraneous offense before considering it in

answering the special issues. Slater states:

> Since at least 1923, the trial court must instruct the jury at the guilt/innocence stage
> that it cannot consider an extraneous offense unless it believes beyond a reasonable
> doubt that the defendant committed it. Harrell v. State, 884 S.W.2d 154, 157-58 (Tex.
> Crim. App. 1994). The court must give the same instruction upon request at the
> punishment stage. Mitchell v. State, 931 S.W.2d 950, 954 (Tex. Crim. App. 1996).
> Furthermore, *article 37.07*, section 3(a) of the Code of Criminal Procedure provides
> that the jury cannot consider extraneous offenses in assessing punishment unless they
> are proven beyond a reasonable doubt. See Huizar v. State, 12 S.W.3d 479, 481 (Tex.
> Crim. App. 2000).

(Docket Entry No. 21 at 63) (italics added). Respondent counters that the trial court did not err

because the Court of Criminal Appeals did not begin imposing a beyond-a-reasonable-doubt standard

on extraneous offenses until after Slater's trial.

The parties fail to distinguish between jury instructions in the penalty phase of capital and

---

[34]     The Supreme Court currently has under consideration the question of whether *Martinez* "also applies to
procedurally defaulted, but substantial, ineffective assistance of appellate counsel claims." *Davila v. Davis*, No. 16-6219,
2016 WL 8115986 (2016). This Court, however, is "bound to follow [Fifth Circuit] precedent as it exists today." *Ladd
v. Livingston*, 777 F.3d 286, 290 (5th Cir. 2015).

non-capital trials. Article 37.07 of the Texas Code of Criminal Appeals governs the punishment phase of a non-capital trial and allows both parties to offer evidence "as to any matter the court deems relevant to sentencing, including but not limited to . . . evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt . . . ." TEX. CODE CRIM. PRO. art. 37.07(3)(a); *see also Jackson v. State*, 992 S.W.2d 469, 477 (Tex. Crim. App. 1999). In contrast, the Court of Criminal Appeals has held that

> [t]he evidence in capital cases is controlled by *article 37.071*, which contains no such restriction on the introduction of extraneous offense evidence. Furthermore, a jury in a non-capital case receives no instruction comparable to the special issues instructions in a capital case; this distinction explains the requirement in noncapital cases that the jury be separately instructed not to consider extraneous offenses unless they are proven beyond a reasonable doubt.

*Jackson*, 992 S.W.2d at 477 (emphasis added). The only burden Texas places on extraneous offenses in a capital sentencing hearing is "the obligation of 'clearly proving' to the trial court that the extraneous offense was committed and that [the defendant] was the perpetrator." *Hughes v. State*, 24 S.W.3d 833, 842-43 (Tex. Crim. App. 2000); *see also Burks v. State*, 876 S.W.2d 877, 909 (Tex. Crim. App. 1994).

The jury instructions in this case conformed to Texas law by requiring "clear evidence" that Slater engaged in the extraneous offenses. Clerk's Record at 76. The law did not require the trial court to provide any more rigorous requirement and appellate counsel did not neglect to raise a meritorious claim. The Court will deny this claim.

### E.    The Death Penalty (Claim Five)

Slater's final habeas claim argues that the death penalty violates the constitutional prohibition on cruel and unusual punishment. Slater asks this Court to expand the record and permit discovery

41

to explore the use of capital punishment nationwide. Slater did not raise this claim in state court and has not shown that he can overcome any procedural default.[35] The Court cannot grant relief on the merits of this claim.

In the alternative, Slater's claim lacks merit under the current law. Slater primarily relies on a dissenting opinion in *Glossip v. Gross*, ___ U.S. ___, 135 S. Ct. 2726, 2755-80 (2015), where Justice Breyer, joined by Justice Ginsberg, considered perceived problems with the death penalty, including "lack of reliability, the arbitrary application of serious and irreversible punishment, individual suffering caused by long delays, and lack of penological purpose." *Id.* at 2776. Justice Breyer urged the Supreme Court to consider full briefing on "whether the death penalty violates the Constitution." *Id.* at 2755.

The Supreme Court has never held that the death penalty itself, rather than the means to impose it or mechanisms to carry it out, violates the Constitution. The *Glossip* majority recognized that "it is settled that capital punishment is constitutional . . . ." 135 S. Ct. at 2732; *see also Baze v. Rees*, 553 U.S. 35, 47 (2008) ("[C]apital punishment is constitutional."); *Kennedy v. Louisiana*, 554 U.S. 407, 420 (2008) ("[T]he death penalty is not invariably unconstitutional[.]"). Justice Breyer's dissenting opinion in *Glossip* was only a dissent, an invitation for further consideration by his fellow justices. Justice Breyer's comments did not create new, clearly established federal constitutional law. This Court is "bound by prior Supreme Court cases until such time as it is expressly overruled by that Court." *United States v. Holmes*, 822 F.2d 481, 503 n.2 (5th Cir. 1987). This Court would be

---

[35]     Slater argues that ineffective representation by state habeas counsel should forgive the procedural bar of his final claim. The Fifth Circuit has refused to apply *Martinez* to "claims [that] do not pertain to the effectiveness of counsel." *Vasquez v. Stephens*, 597 F. App'x 775, 778 (5th Cir. 2015); *see also Wilkins v. Stephens*, 560 F. App'x 299, 306 n.44 (5th Cir. 2014); *Reed v. Stephens*, 739 F.3d 753, 778 (5th Cir. 2014).

compelled to deny relief even if Slater's challenge to capital punishment was fully available for federal review.

## IV.    Certificate of Appealability

Under AEDPA, a prisoner cannot seek appellate review from a lower court's judgment without receiving a Certificate of Appealability ("COA"). *See* 28 U.S.C. § 2253(c). Slater has not yet requested that this Court grant him a COA, though this Court can consider the issue *sua sponte*. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000). "The COA statute establishes procedural rules and requires a threshold inquiry into whether the circuit court may entertain an appeal." *Slack v. McDaniel*, 529 U.S. 473, 482 (2000). A court may only issue a COA when "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The Fifth Circuit holds that the severity of an inmate's punishment, even a sentence of death, "does not, in and of itself, require the issuance of a COA." *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000). The Fifth Circuit, however, anticipates that a court will resolve any questions about a COA in the death-row inmate's favor. *See Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000). The Supreme Court has explained the standard for evaluating the propriety of granting a COA on claims rejected on their merits as follows: "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy §2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack*, 529 U.S. at 484; *Miller-El*, 537 U.S. at 336-38. On the other hand, a district court that has denied habeas relief on procedural grounds should issue a COA "when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states

43

a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. *Slack*, 529 U.S. at 484; *Miller-El*, 537 U.S. at 336-38. Unless the prisoner meets the COA standard, "no appeal would be warranted." *Slack*, 529 U.S. at 484.

Slater's petition raises issues worthy of judicial review. Nevertheless, having considered Slater's petition in light of AEDPA's standards and controlling precedent this Court determines that a COA should not issue on any claims.

## V.    Conclusion

For the reasons discussed above, the Court **GRANTS** Respondent's motion for summary judgment, **DENIES** Slater's petition for a writ of habeas corpus, and **DISMISSES** this case **WITH PREJUDICE**. The Court will not certify any issue for appellate review.

The Clerk will provide copies of this Order to the parties.

SIGNED on _____**MAR 3 0 2017**_____, at Houston, Texas.

ALFRED H. BENNETT
UNITED STATES DISTRICT JUDGE

44